# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**DENNIS ZAMORA,**

      **Plaintiff,**

v.                               **No. 12-CV-550 MCA/CG**

**BOARD OF EDUCATION FOR THE**
**LAS CRUCES PUBLIC SCHOOLS,**

      **Defendants.**

## MEMORANDUM AND OPINION ORDER

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Doc. 44]. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the Motion.

## FACTUAL AND PROCEDURAL BACKGROUND

In March of 2011, Plaintiff Dennis Zamora filed with the Equal Employment Opportunity Commission a Charge of Discrimination against his employer based on National Origin. [Doc. 3] He was issued his right to sue [Doc. 3], and timely filed this suit on May 21, 2012, against Las Cruces Public Schools and Stan Rounds (Individually), alleging National Origin Discrimination; a Hostile Work Environment; Wrongful Termination; and Negligent Hiring, Training and Supervision and seeking both compensatory and punitive damages. [Doc. 1] On April 1, 2013, the Court entered a Stipulated Order Granting Defendants' Motion for Partial Dismissal with Prejudice, dismissing Plaintiff's claim of

1

Negligent Training and Supervision as well as his claim for punitive damages. [Doc. 66] In the same Order, the Court dismissed Plaintiff's claims against Defendant Stan Rounds individually and substituted the Board of Education for the Las Cruces Public Schools (instead of Las Cruces Public Schools) as the sole remaining Defendant in this action. [Doc. 66]

Plaintiff began working for Defendant Board of Education for the Las Cruces Public Schools in 1994, and became an administrator for Defendant in 2005. [Doc. 51, p. 12, A.1-A.2]  His last position was Title I Coordinator, and, in that position, he coordinated approximately seven federal, state and private programs. [Doc. 51, p. 12, A.3] His last supervisor gave him positive evaluations based on his work performance. [Doc. 51-1 p. 22:1-6] Plaintiff has submitted testimony by his supervisor, his second level supervisor and one of his peers that they never observed him create a hostile work environment or make inappropriate or sexual advances. [Doc. 51-1, p. 21:8-25; Doc. 51-4 p. 9:22 to 10:22; Doc. 51-2, p. 18:7-14] Defendant concedes that Plaintiff had a satisfactory career and that it did not terminate him for poor work performance. [Doc. 61, p. 3, ¶ A.3]

Stan Rounds became the Superintendent for Defendant in approximately 2007. [Doc. 51-2, p. 10:11-15] Superintendent Rounds hired James Nesbitt, a former superintendent from Truth or Consequences, to be the Director of Human Resources for Defendant, even though Superintendent Rounds believed that in Mr. Nesbitt's previous position a lawsuit or EEOC charge was filed against him for allowing a "class simulation" about segregation in which signs were hung above drinking fountains stating "Whites Only" and "People of Color."

[Doc. 51-7, p. 1; Doc. 51-2, p. 64:2 to 65:9] Superintendent Rounds testified that he hired Mr. Nesbitt because "we did due diligence on his background.  He maintained his license, et cetera, et cetera.  I've known Mr. Nesbitt as a superintendent for a number of years, and I had already drawn conclusions about his abilities." [Id.]

When Mr. Nesbitt retired, Superintendent Rounds "laterally transferr[ed]" a Caucasian woman, Andrea Fletcher, to the position of Director of Human Resources without advertising the position. [Doc. 61-3, p. 60:2-9] He subsequently "re-codified [her] operation, redefined those duties slightly and took the directorship and translated it to an assistant superintendency." [Doc. 61-3, p. 60:22 to 61:3]  Plaintiff's immediate supervisor, Erlinda Martinez, a Hispanic, testified that both she and another Hispanic woman (who had been the administrator in charge prior to Superintendent Rounds being hired) had more experience than Ms. Fletcher, and Ms. Martinez would have liked the opportunity to apply for the position. [Doc. 51-1, p. 36:13 to 39:18] Ms. Martinez testified: "[T]here's a flaw in the system in terms of inconsistency for advancement[.] . . . So the appointments it seemed like a pattern, yes, that there was a lot of white people appointed, but there was also a couple of Hispanics in there as well.  So my feelings, my observations as an outsider looking in, that is the appearance that it could be discrimination." [Doc. 51-1, pp. 53:19 to 54:5]

In 2009-10, Plaintiff began supervising a Parents in Education program, and, as part of that program, he supervised several employees whom he had not previously supervised. [Doc. 45-1, p. 14] Some employees were unhappy with Plaintiff's management style, while others believed Plaintiff was a good supervisor. [Doc. 45-1, p. 22] In May and June 2010,

two employees wrote letters complaining of Plaintiff's management style. [Doc. 45-1, pp. 14, 15]  Then, in September of 2010, two different employees who worked under him filed complaints of Harassment, Intimidation or Bullying. [Doc. 45-1, p. 15] One employee complained that Plaintiff screamed and yelled insults such as "you're worthless" and "now I'm not impressed," called her a complainer and one who gripes, and called her lazy.  She complained that he threw some forms at her that were not signed, and told her he had eyes and ears everywhere. [Doc. 45-1, p. 19, ¶ 4] She further complained that she was in trouble if she did not have her radio and that other employees who were younger and wore short skirts and ragged jeans were more favorably treated. [Doc. 45-1, p. 19, ¶ 4; Doc. 45-1 p. 33] The other employee complained that Plaintiff yelled at her while he stood bending over her with his hands on his knees, his face about 12 inches from her. [Doc. 45-1, p. 19, ¶ 5] She said that this incident made her cry for ten minutes and she felt "thoroughly devastated." [Id.] She complained that he yelled at her when she could not access or respond to emails because her computer had not yet been set up, and that he yelled at her over the radio which was overheard by the people at the location. [Id.] She also stated that she was not allowed compensatory time, though she had to work more than her regular duty day; and that other employees were paid compensatory time. [Id.]

These complaints were investigated by Defendant's Human Resources Department, and though Defendant contends that "[i]nformation indicating a hostile work environment emerged," the record does not reflect any disciplinary action taken against Plaintiff in response. [Doc. 45-1, p. 15]  Then, in December of 2010, another employee met with the

4

Superintendent and complained that Plaintiff created a hostile work environment and had harassed her.[1] [Doc. 45-1, p. 15] Superintendent Rounds contends that Plaintiff called the employee while she was meeting with him, and she was visibly shaken from the phone call. [Doc. 45-1, p. 37, ¶ 5] After this complaint, the Superintendent "decided to initiate an independent investigation through the School District's attorneys. The School District hired, through its counsel, June Romero to conduct the independent investigation." [Doc. 45-1, pp. 37-38, ¶ 6] During the investigation, Superintendent Rounds placed Plaintiff on paid administrative leave. [Doc. 45-2, p. 15-16]

In the investigation,[2] the employee who complained in December of 2010 told the investigator that she was afraid of retribution from Plaintiff, and that she was tired of being scared, insulted, and treated as trash. She reported that Plaintiff told her she was old and to shut up and get out of here, and that in a meeting he told the Family Educators that they were worthless. [Doc. 45-1, p. 17, ¶ 1] She further indicated that every time her location changed

---

[1] Plaintiff contends that the Superintendent called this employee in to meet with her. [Doc. 51-5, p. 153:18-22] He said he learned this from Erlinda Martinez, but the deposition testimony of Ms. Martinez provided by Plaintiff does not proffer such evidence. As such, this contention will be disregarded as hearsay. *See* Fed. R. Civ. P. 56(c)(2); *see also Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 486 (10th Cir. 1995) ("[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill." (Internal quotation marks, citation and alterations omitted)).

[2] Plaintiff objects to Defendant's reliance on the Investigative Report for purposes of summary judgment. Plaintiff's objections are based on hearsay and hearsay within hearsay. [Doc. 51, pp. 1-2] The Court addresses Plaintiff's objections in full later in this opinion.

5

she had to radio in her location, but that other employees did not have to do so. [Id.] She said that she was promised a stipend for being a leader, but after six months Plaintiff told her she was not doing what she was supposed to and would not get the stipend, and instead a different employee was given the stipend for being the leader. [Id.]

The investigator also interviewed both current and past employees who Plaintiff had supervised. [Doc. 45-1, 16-17] Several employees indicated that some employees were given special treatment [Doc. 45-1, p. 19 ¶¶ 2, p. 21, ¶11] and others were required to call in on their radio or work extra hours without pay [Doc. 45-1, p. 18, ¶ 2, p. 19, ¶4], that Plaintiff yelled at employees [Doc. 45-1, p. 19, ¶¶ 4, 5], and if he did not like an employee or if an employee complained about him or disagreed with him they were given a hard time [Doc. 45-1, p. 18, ¶ 2, p. 20, ¶ 8].  Another employee complained that at a breakfast meeting, Plaintiff told her "You really look good[.] Wow, no really, you look awesome," and that she believed the comments had an overture of sex. [Doc. 45-1, p. 25, ¶ 4] She further testified that when she overtly refused Plaintiff's advances, he began to demand that she work beyond her duty day and without pay, which she refused, and thereafter the "professional relationship severed." [Doc. 45-1, p. 25, ¶ 4] This former employee signed an affidavit stating that she had reviewed the contents of the report and they were based on her first hand knowledge and accurate, but she hand wrote "with the exception of page 12, paragraph 5, wherein it states Deniss (*sic*) Zamora solicited sexual favors[.]" [Doc. 45-2, p. 10] The statement that Plaintiff solicited sexual favors is located in an introductory paragraph to a section of the report entitled "Evidence from interviews and written documentation that Dennis Zamora Sexually

6

Harassed female employees." [Doc. 45-1, p. 24]

Another former employee claimed that Plaintiff "talked to her in sexual and unclean ways." [Doc. 45-1, pp. 25-26, ¶ 5] For example, she reported that Plaintiff threatened to bend her over and spank her with a wet noodle when she made a mistake, a comment which she considered to be unprofessional and which made her uncomfortable. [Id.] She further said he propositioned her by asking her if she used drugs, or whether she would use drugs if there was a safe place for her to use them. [Id.] She believed these comments indicated Plaintiff "was offering her drugs in exchange [for] sexual favor." [Id.] This former employee further stated that when she refused his propositions she was put on a professional development plan, which she believed was to discredit her if she were to file sexual harassment charges. [Id.] She also reported that when she resigned, Plaintiff told her that he was afraid that she was going to file sexual harassment charges against him and he knew he had acted unprofessionally. [Id.] Finally, she said she resigned because she knew that if she remained "he'd expect sexual favors." [Id.]

After reviewing the Report of Investigation, Superintendent Rounds sent Plaintiff a "Notice of Termination." [Doc. 45-2, pp. 18-20] In the letter, Superintendent Rounds stated he had decided "to terminate your employment" and that Plaintiff would "remain on administrative leave with pay until your current employment contract terminates under its own terms." [Id.] The Superintendent indicated that his decision to terminate Plaintiff was based on misconduct, violation of the standards of professional conduct, favoritism, failing to maintain a professional demeanor in interacting with his subordinates resulting in an

"uncomfortable work environment," a pattern of sexual harassment, taking "adverse employment action against female employees who rebuffed your attempts to obtain sexual partners for extramarital affairs," and giving preferred employees compensatory time. [Id.]

Plaintiff denied all of the allegations against him as reported in the Report of Investigation. [Doc. 51, p. 5; Doc. 51-5, p. 96:15 to p. 105:10, p. 142:23 to 148:25] With regard to the three employees who initiated complaints about him, he testified that one "was having a very difficult time adjusting and showing that she had the capacity of getting her job done effectively," that he had not yelled at another but instead she had yelled at him, and that the third was a "subpar" employee and he had to "call her on particular issues such as her demeanor with our customers or the public." [Id.] As to another former employee who had reported that Plaintiff made sexual advances toward her, Plaintiff testified that she had falsified time sheets. [Doc. 51-5, p. 143:13 to 144:14] Finally, he proffered testimony from his supervisor questioning the honesty of some of the employees who had complained. By way of example, there was a question about whether one employee was conducting the family visits she claimed to be conducting. [Doc. 51-1, pp. 50:5 to 52:7]

Plaintiff further challenges the regularity of the investigation, contending that the investigator was not independent, as she and Superintendent Rounds had known each other since Rounds was a child, for over 30 years [Doc. 51, p. 7, ¶ 7; Doc. 51-2, pp. 28:19 to 29:13]. He expressed that neither Superintendent Rounds nor the investigator told Plaintiff he was being investigated for sexual harassment; and he further asserted that when Superintendent Rounds put him on administrative leave, he told Plaintiff that he never loses

a case.  Plaintiff interpreted this comment to mean that Rounds had already decided to terminate him. [Doc.  51-5, p. 156:5-22]

Plaintiff argues that Superintendent Rounds declined to renew his contract based on Plaintiff's National Origin and that Superintendent Rounds orchestrated the investigation which was just a "witch hunt" to get rid of him. [Doc. 51, p. 6, ¶6; Doc. 51-5, pp. 153:12 to 154:6 and 156:5-22]  Plaintiff contends that there had been efforts to force him to resign since May of 2010. [Doc. 51-2, pp. 85:14 to 86:8; Doc. 51-5, pp. 125:8-20, 155:9 to 156:11, 172:15 to 173:3]  Finally, Plaintiff submits that for a long period before the complaints and investigation, Superintendent Rounds had refused meetings with Plaintiff to review his programs. [Doc. 51-5, pp. 123:23 to 124:20]

Additional facts are discussed below as they are relevant to the Court's analysis.

## ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1291 (10th Cir. 1999) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(a).  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. *Luster v. Vilsack*, 667 F.3d 1089, 1096 (10th Cir. 2011).  In ruling on a motion for summary

judgment, the Court does not weigh the evidence and determine the truth of the matter, but simply determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Judgment is appropriate as a matter of law if the nonmoving party has failed to make a showing on an essential element of his case, as to which he has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

## **Title VII**

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail under Title VII, a plaintiff must show intentional discrimination through either direct or indirect evidence. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). Here, Plaintiff does not assert that he has presented direct evidence of discrimination. [Doc. 51, p. 21 (arguing that Plaintiff has presented circumstantial evidence of pretext and racial motivation)] Thus, the only relevant question for the Court is whether Plaintiff has brought forth indirect evidence of intentional discrimination.

In deciding whether summary judgment is appropriate, the Court must apply the *McDonnell Douglas* burden-shifting framework to determine whether a plaintiff has set forth sufficient indirect evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this burden shifting analysis, the Plaintiff must first

establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he was subject to an adverse employment action, and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination.  *See EEOC v. PVNF, LLC,* 487 F.3d 790, 800 (10th Cir. 2007); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).  If Plaintiff establishes a prima facie case, the burden then shifts to Defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *See id.*; *Plotke v. White,* 405 F.3d 1092, 1099 (10th Cir. 2005).  If the Defendant meets its burden of production by offering a legitimate, nondiscriminatory reason for its employment action, the burden shifts back again to Plaintiff to establish a genuine issue of material fact as to whether the proffered reason is pretextual.  *Plotke*, 405 F.3d at 1099.  "[A]ll inferences arising from the record before us must be drawn and indulged in favor of the nonmovant.  Credibility determinations and the weighing of the evidence are jury functions," and inappropriate at the summary judgment stage.  *Id.*, at 1093-94 (internal quotation marks, citations and alterations omitted); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

### *Prima Facie Case of Discrimination*

Plaintiff is Hispanic, and it is undisputed that he is a member of a protected class with regard to his National Origin. [See Doc.45]  Further, two supervisors for Defendant, both Plaintiff's last supervisor and the interim superintendent preceding Mr. Rounds, testified that Plaintiff was qualified for his position. [Doc. 51-1 pp. 18:10-16, 22:1-6; Doc. 51-4, p. 8:1-9] Defendant does not dispute that Plaintiff had a satisfactory career and work performance, and

11

submits it relied instead on misconduct as the basis for terminating him. [Doc. 61 p. 3, ¶ A.3]

Defendant contends that its decision not to renew Plaintiff's administrator contract was not an adverse employment decision.  In so arguing, Defendant relies on *Swinney v. Deming Bd. of Ed.*, 117 N.M. 492, 873 P.2d 238 (N.M. 1994), which held that a Superintendent did not establish a breach of his employment contract under New Mexico law because, among other things, under then existing statutes administrators were not entitled to a due process hearing.  *Id.* at 493, 873 P.2d at 239.  This contract law holding, however, does not inform on the question of whether the decision not to renew an employment contract constitutes an adverse employment action for purposes of Title VII.  Our Tenth Circuit has held that the decision to not renew an administrator's contract is an adverse employment action.  *Dirusso v. Aspen Sch. Dist. No. 1,* 123 Fed. Appx. 826, 832 (10th Cir. 2004) (unpublished decision); *see also Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1380-81 (10th Cir. 1994) (considering non-renewal of the principal's employment contract to be an adverse employment action).  The Court determines that Plaintiff has proffered evidence of an adverse employment action.

Defendant next contends that Plaintiff has not established that the adverse employment action "took place under circumstances giving rise to an inference of discrimination."  *PVNF*, 487 F.3d at 800.  A plaintiff can meet this element of his *prima facie* case by proffering various evidence, including:

> actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, preferential treatment given to employees outside the protected class, in a corporate downsizing, the systematic transfer of a

discharged employee's duties to other employees, or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified. A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, or, more generally, upon the timing or sequence of events leading to plaintiff's termination.

*Plotke*, 405 F.3d at 1101 (internal quotation marks, citation and ellipses omitted).

Plaintiff testified that Caucasian individuals took over his duties (though there is no evidence proffered that he was replaced). [Doc. 51-5, p. 184:11-18] Further, Plaintiff's direct supervisor, a Hispanic woman, testified that Superintendent Rounds selected a Caucasian woman as Assistant Superintendent of Human Resources without posting the position and allowing employees to compete for it. [Doc. 51-1 pp. 36:13 to 39:18] Plaintiff's supervisor testified that both she and another Hispanic woman were more qualified for the position and she would have liked an opportunity to apply for the position. [Id.] The Court will assume Plaintiff's evidence fulfills Plaintiff's *"de minimis"* burden to show circumstances giving rise to an inference of discrimination. *Id.*

### Legitimate, Nondiscriminatory Reason for Discharge

If, as here, Plaintiff has met his burden of establishing a *prima facie* case of discrimination, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *PVNF,* 487 F.3d at 800. Defendant has submitted that Superintendent Rounds made the decision not to renew Plaintiff's contract, and that he did so because, after the investigation was complete, he determined that "Dennis Zamora had engaged in conduct that violated Board of Education

13

Policy ACA prohibiting sexual harassment" and because Plaintiff had "been violating Board of Education Policy 236 by awarding compensatory time to employees, which is reserved only to the Superintendent." [Doc. 45-1 pp. 37-38]

### Consideration of the Investigative Report

In articulating a legitimate, nondiscriminatory reason for its adverse employment action in this case, Defendant relies heavily on a "Report of Findings Investigation: Dennis Zamora, Coordinator" (Report of Investigation) completed in January 2011, by an outside investigator hired by Defendant's legal counsel. [Doc. 45-1, p. 11] In 2013, Defendant had various individuals who had been interviewed during the investigation sign affidavits indicating they read the report and confirmed that the contents are correct and accurate and based on personal knowledge. [Doc. 45-1, pp. 31-33, 35; Doc. 45-2 pp. 9-13]

Plaintiff challenges Defendant's reliance on the Report of Investigation, arguing that it is hearsay and that the statements in the Report of Investigation from individuals interviewed by the investigator constitutes hearsay within hearsay, citing, *inter alia*, *Johnson v. Weld County*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). [Doc. 51, pp. 1-2] Plaintiff further challenges the affidavits on the grounds that they "fail to address specific instances of misconduct that each accuser has against the Plaintiff.  The Plaintiff has the right to know the specific factual allegations of his accusers and has been denied that right by the Defendants' use of the Romero Report as their evidence that the Plaintiff allegedly engaged in very serious accusations of sexual and other misconduct." [Doc. 51, p. 2] Thus, Plaintiff requests this Court to strike both the report and the affidavits. [Id.] Defendant counters that,

as to the interviewees whose statements are supported by affidavits, Defendant has met the requirement of Rule 56 to produce sworn testimony. [Doc. 61, p. 9] Defendant further submits that the investigator can "testify at trial that she conducted an investigation into this matter and that the witnesses provided her with information for her report" without testifying as to the contents of the witnesses' statements.  [Doc. 61, p. 10] Defendant also argues, *inter alia*, that the Report of Investigation can be offered not for the truth of the matter, but to show that Superintendent Rounds believed he had a legitimate reason to terminate Plaintiff. [Doc. 61, pp. 9-10]

Sworn testimony is admissible for summary judgment purposes as long as the testimony is of a type that would be admissible if the swearing witness testified at a trial on the matter. See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir.1995) (stating that a party need not produce evidence in a form that would be admissible at trial, but the substance of the evidence must be admissible). Our Tenth Circuit has held that sworn statements taken in the course of SEC investigations are the equivalent of affidavits, and as such, they may be used to support a motion for summary judgment. *See Secs. Exch. Comm'n v. Am. Commodity Exch.*, *Inc.*, 546 F.2d 1361, 1369 (10th Cir. 1976).  Thus, for those interviewees for whom Defendant has submitted affidavits, Defendant has overcome Plaintiff's objection to one level of hearsay.  When coupled with the investigator's affidavit, Defendant has overcome

Plaintiff's objection based on hearsay within hearsay.  Defendant has complied with Rule 56's requirement to submit evidence based on personal knowledge, the substance of which would be admissible at trial.

Defendant did not, however, submit affidavits for each interviewee.  Thus, for some, the statements are unsworn testimony.  Even so, to the extent Defendant were to offer the Report of Investigation not for the truth of the matter asserted, but for the limited purpose of establishing why Superintendent Rounds made the decision to not renew Plaintiff's contract, the Court determines that the Report would be admissible.  *See Otero v. Ntn'l Distrib. Co.,* 627 F.Supp.2d 1232, 1239-40 (D.N.M. 2009) ("[T]he Court can consider unsworn statements offered for non-hearsay purposes.  For example, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind.").  In this case, the effect the Report of Investigation had on Superintendent Rounds' state of mind is relevant to the inquiry of whether Defendant acted in good faith in believing it had a legitimate, non-discriminatory reason for terminating Plaintiff.  The Court, therefore, concludes that the entire report can be considered in evaluating whether Defendant presented evidence that it had a legitimate, nondiscriminatory reason for refusing to renew Plaintiff's contract.

### Whether Defendant has Articulated a Legitimate, Non Discriminatory Business Decision

Defendant argues that Plaintiff was terminated for misconduct by committing acts of sexual harassment and granting compensatory time to individuals in violation of the School

District Policy. [Doc. 45, p. 15]  It argues that the Report of Investigation shows that Plaintiff attempted to solicit sexual favors from women he supervised, and when they refused his advances they felt threatened and retaliated against. [Doc. 45 p. 16] Defendant submits that, based on the investigation, the Superintendent believed that, at the least, Plaintiff "repeatedly placed himself in social positions with his female subordinates . . . creating substantial potential civil liability for the School District based on his improper supervisory conduct" and, at the worst, that Plaintiff engaged in a "practice and pattern . . . [of] *quid pro quo* sexual harassment in violation of the School District's policies[.]" [Doc. 45, p. 16]  Finally, the District argues that it "fulfilled its duty to enforce its sexual harassment and employee compensation policies by conducting an independent investigation and following its policies in taking appropriate action against the Plaintiff." [Doc. 45 p. 17]

This Court concludes that Defendant has articulated a legitimate, nondiscriminatory basis for ending Plaintiff's employment.  *See Reeves*, 530 U.S. 133, 142 (2000) (concluding that the employer "met this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of his failure to maintain accurate attendance records").

### *Evidence of Pretext*

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148.  In determining whether a plaintiff has proffered evidence of pretext:

> *We do not ask whether the employer's reasons were wise, fair or correct; the*
> *relevant inquiry is whether the employer honestly believed its reasons and*
> *acted in good faith upon them. Even a mistaken belief can be a legitimate,*
> *non-pretextual reason for an employment decision.* Thus, we consider the
> facts as they appeared to the person making the decision, and we do not
> second-guess the employer's decision even if it seems in hindsight that the
> action taken constituted poor business judgment. The reason for this rule is
> plain: our role is to prevent intentional discriminatory hiring practices, not to
> act as 'a super personnel department,' second guessing employers' honestly
> held (even if erroneous) business judgments.

*Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118-19 (10th Cir. 2007) (emphasis added,

internal quotation marks and citations omitted).

An employee can proffer various evidence of pretext. For example, "a plaintiff can

show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence." *Plotke*, 405 F.3d at

1102. A plaintiff can produce "evidence that the defendant's stated reason for the adverse

employment action was false[, or] evidence that the defendant acted contrary to a written

company policy prescribing the action to be taken by the defendant under the

circumstances[,] or . . . evidence that the defendant acted contrary to an unwritten policy or

contrary to company practice when making the adverse employment decision." *Id.*

Alternatively, the plaintiff can show that the "employer's proffered non-discriminatory

reasons were either a *post hoc* fabrication or otherwise did not actually motivate the

employment action." *Id.* at 1102-03 (internal brackets omitted).

The Court considers in turn Plaintiff's proffered evidence of pretext. Plaintiff first

argues that he can demonstrate discriminatory animus because Superintendent Rounds hired, as director of Human Resources, James Nesbitt, a Caucasian. [Doc. 51, p. 14]  Mr. Nesbitt was investigated by the New Mexico Public Education Department based on accusations that, while he was the superintendent of schools in Truth or Consequences, signs were placed above drinking fountains at a school stating "Whites Only." [Doc. 51, p. 14; 51-7] The Truth or Consequences District indicated the signs were part of a school project on racism. [Doc. 51-7] Plaintiff submitted as evidence newspaper articles, including one which states that "Nesbitt and other educators reached a settlement with state officials in March.  The state settlement said that the student-initiated project created at least the appearance of discrimination and should not have been approved." [Doc. 51-7] Superintendent Rounds, knowing of the allegations stated, that Mr. Nesbitt "had to say grace over the fallout that came from that," considered the event to be "a term I'll call a rhubarb" and selected Mr. Nesbitt as the Human Resources Director. [Doc. 51-2, pp. 63:22 to 65:9]

Based on this proffer, the Court concludes that no reasonable jury could infer that Defendant's proffered reason for terminating Plaintiff (Plaintiff's alleged misconduct) is unworthy of belief, or that the actual reason for terminating Plaintiff was his National Origin. Essentially, Plaintiff asks this Court to determine that a jury could infer--based on the fact that Superintendent Rounds hired a man who had been accused of allowing a school project which, at the least, gave the appearance of discrimination--that Superintendent Rounds was therefore motivated by National Origin *in ending Plaintiff's employment*.  Such an inference does not follow from the evidence proffered by Plaintiff.  There is no nexus between

Superintendent Rounds' decision to employ Mr. Nesbitt and Plaintiff's termination.  With respect to pretext, "the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions."  *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005); *see also Riggs*, 497 F.3d at 1119, 1121 (stating that the Court's "task is to determine whether a reasonable jury could disbelieve [the employer's] asserted reasons for terminating [the employee] based on this evidence" and concluding that the employee's proffered evidence of inconsistencies in testimony "has no bearing whatsoever" on whether the employer's proffered reason was pretextual); *Locke v. Grady County*, 437 Fed. Appx. 626, 630-32 (10th Cir. 2011) (unpublished decision) (holding that the employee's evidence did not establish that the employer's proffered legitimate business reason for terminating the employee (a report and investigation substantiating allegations that the employee had sexually harassed other employees) was pretextual).  The proffered evidence regarding Mr. Nesbitt has no bearing on the question of whether Defendant's purported legitimate, non-discriminatory reason for placing Plaintiff on leave and declining to renew his contract was pretextual.  As such, this evidence does not establish a genuine issue of material fact for trial.

Plaintiff next relies on evidence that in 2007 and 2008, and again after Plaintiff's contract was not renewed, Superintendent Rounds reassigned some of Plaintiff's duties to Caucasian employees. [Doc. 51, p. 15] As to the 2007 and 2008 events, Defendant submits that Plaintiff did not file a timely Charge of Discrimination and thus Plaintiff is time-barred from asserting a claim based on those events, and that "none of the allegations that occurred

prior to May 25, 2010, show the alleged harassment was severe or pervasive, nor does it show that the alleged hostile environment was racial or stemmed from racial animus." [Doc. 45, pp. 13-14] Plaintiff responds by arguing that "[t]he crux of Plaintiff's lawsuit is a wrongful discharge claim under Title VII and the Plaintiff is well within the time-frame to bring that action and show evidence of a pattern of conduct by Rounds which led to the Plaintiff's termination." [Doc. 51 p. 23] Plaintiff argues that evidence beyond the 300 day filing period can be used to establish a continuing policy or practice of discriminatory acts, relying on *Furr v. AT&T Tech's, Inc.*, 824 F.2d 1537, 1543 (10th Cir. 1987) ("Discriminatory acts occurring before the filing periods are relevant evidence of the continuing unlawful practice and its discriminatory intent[.]").  Plaintiff fails, however, to acknowledge that *Furr* and subsequent case law has held that "the continuing violation theory may not be used to challenge discrete, unrelated acts occurring entirely outside the statutory filing periods." *Id.* at 1544; *Martinez v. Wyoming Dep't of Family Servs*, 218 F.3d 1133, 1138 (10th Cir. 2000) (pointing out that the court will consider acts prior to the filing period after considering "[f]irst, . . . whether the incidents were of the same type of discrimination; second, the frequency of the incidents; and third, whether the nature of the incidents should have made the employee aware of the need to assert his rights.").  Here, Plaintiff has not explained, nor can the Court assess, how the prior acts of reassigning his duties are related to his termination. [Doc. 51, p. 23] More to the point, the Court does not perceive how the reassignment of some of Plaintiff's duties in 2007 and 2008 demonstrates or permits an inference that the termination of Plaintiff on the basis of the complaints of sexual harassment

21

and hostile work environment, and the subsequent investigation substantiating those complaints, was pretextual.   *Riggs*, 497 F.3d at 1119, 1121.

Plaintiff points to Superintendent Rounds' statement that New Mexico's Hispanic governor, Susanna Martinez, does not know what she is doing, as evidence of discrimination. However, stating that a political figure does not know what she is doing, without more, is not evidence of racial animus.

Plaintiff relies on both deposition testimony and secretly recorded conversations[3] of two other employees of the Board of Education of Las Cruces Public Schools to establish discriminatory animus.  First, Plaintiff secretly recorded a conversation he had with his immediate supervisor, Erlinda Martinez, in which she responded to Plaintiff's statement that he felt discriminated against on the basis of National Origin and that Superintendent Rounds filled positions with Caucasians "nine times out of ten," by saying "Yeah.  Yeah, well, I feel that way too.  You know I think several of us feel that way." [Doc. 51-8 p. 2-3].   At her deposition, when asked whether she agreed with her previous statement, she said:

> That is my statement, but this is the way I feel, and I believe it was stated earlier or sometime, it's a flaw in the system of when positions – and I'm talking administrative positions – are opened up and why some people are appointed versus having to go through a selection process, and some of the individuals that were mentioned were appointees.  And because there's a flaw in the system in terms of inconsistency for advancement – or it has an

---

[3] Defendant has filed a *Motion in Limine* to prevent Plaintiff from relying on the secretly recorded conversations at trial. [Doc. 42]  This Court, though considering the content of those recorded conversations for purposes of ruling on Defendant's Motion for Summary Judgment, does not here address or rule on Defendant's *Motion in Limine* regarding the secretly recorded conversations.

appearance of, Well, why these people and why not?  And how come these
people had to go through a process of interviewing and so on?  So the
appointments it seemed like a pattern, yes, that there was a lot of white people
appointed, but there was also a couple of Hispanics in there as well.

So my feelings, my observations as an outsider looking in, that is the
appearance that it could be discrimination.

[Doc. 51-1, pp. 53:7 to 54:5] Ms. Martinez further testified that, in her opinion, a Caucasian

woman was promoted over both herself and another more experienced Hispanic woman to

the position of Director of Human Resources. [Doc. 51-1 pp. 36:13 to 39:18] Ms. Martinez

testified that she did not know why neither she nor the other Hispanic woman were offered

the opportunity to apply for the position. [Id.]

This evidence does not create a genuine issue of material fact as to whether the

decision to end Plaintiff's employment was pretextual.  Again, there is no connection

between the failure to promote either of the well-qualified Hispanic employees to the position

of Director of Human Resources and the allegations against Plaintiff, the investigation into

those allegations, and the decision to not renew Plaintiff's contract.  Thus, this is not

evidence from which a jury could infer that Defendant did not believe, based on the

allegations and the Report of Investigation, that it had a legitimate reason for terminating

Plaintiff.  The simple fact that Plaintiff and the women not promoted are all Hispanic is not

sufficient to show pretext, even if it were enough to meet Plaintiff's *de minimis* burden of

showing circumstances giving rise to an inference of discrimination for purposes of his *prima*

*facie* case, because it fails to rebut the proffered legitimate, non-discriminatory basis for

terminating Plaintiff.  Additionally, this evidence falls very short of statistical evidence

which can be used as evidence of pretext.  *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1223 (10th

Cir. 2013) (explaining that, among other things, statistical evidence must be statistically

significant).

Similarly, Plaintiff has produced both a secretly recorded conversation between

himself and his friend, Todd Gregory, who is the Safety Security Coordinator for Defendant,

as well as deposition testimony of Todd Gregory.  In the secretly recorded conversation,

Plaintiff would make a statement that he believed he was discriminated against, and Mr.

Gregory would agree.  For example:

> Mr. Zamora: So you throw those two out, it's – it has to be the – the
> discrimination.  It has to be that I just probably got too much respect from–
> Mr. Gregory: Yeah.
> Mr. Zamora:  – everybody in gen – general so he had to say –
> Mr. Gregory: Right.
> Mr. Zamora:  – "I just don't like him because he's a Mexican."  And –
> Mr. Gregory: Yeah, I mean, or, you know, (inaudible) that could play into the
> politics too, the issues too.  You know, like, well, you're too – you're too
> much into the – you know, the politics stuff, too, which I think probably had
> a little bit to do with it.
> Mr. Zamora: I think like who I know and stuff like that.
> Mr. Gregory: Right.  Exactly.  Yes, Republicans and –
> Mr. Zamora: Oh, good God.  Even though –
> Mr. Gregory: Other big (inaudible) Hispanics, you know.
> Mr. Zamora: And, you know, exactly.  And I think that's what it was.  It was
> that I knew Hispanics and I think it was that it wasn't really the – the
> Democrat/Republican if you think about it –
> Mr. Gregory: Right.  Yeah.
> Mr. Zamora: – because I'm – I'm Democrat.  I'm Democrat.  I'm not straight
> ticket.  And he –
> Mr. Gregory: Right.
> Mr. Zamora: Apparently he's Dem – Democrat straight ticket.  Well, then it
> turns out to be that, well, I was really close with a lot of Hispanics that were
> – happened to be Republicans.
> Mr. Gregory: Right.  Exactly.

> Mr. Zamora: And he didn't want a Mexican around that had that type of tie in the commun – community.  You know, really.  Think about it.  You know, why else would he – why else – if – if I rule out the sexual har – sexual harassment.  If I rule out – I have ruled out sexual harassment.  I ruled out the hostile environment.  What else is left?
> Mr. Gregory: Yeah.  I mean –
> Mr. Zamora: God.
> Mr. Gregory: Yeah.

[Doc. 51-9, pp. 2-4] Or, another instance:

> Mr. Zamora: If you – if you were Mexican, would you have come back?  I mean, would he have – would he have let you come back?
> Mr. Gregory: Oh, yeah, who knows.  I doubt it.

[Doc. 51-9, p. 6]

In his deposition, Mr. Gregory confirmed that he made the statements and that the conversation was "a conversation between two friends." [Doc. 51-3 p. 15:6-13] Viewing this evidence in the light most favorable to Plaintiff, and thus assuming the Court can infer that Mr. Gregory agreed with Plaintiff's belief that Superintendent Rounds ended his employment because of Plaintiff's National Origin, this belief held by Mr. Gregory does not amount to a showing of pretext.  *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that a party must produce specific facts showing that there remains a genuine issue for trial and that a plaintiff's "mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

Plaintiff contends that there were procedural irregularities surrounding the investigation, his being placed on administrative leave, and his termination.  [Doc. 51 p. 13]

He contends that Rounds informed him he would terminate him regardless of the outcome of the investigation. [Id.] In support, Plaintiff cites a section of his deposition in which he testified:

> My last conversation I had with [Superintendent] Stan [Rounds] was that, I do not lose a case, I will get rid of you. I do not lose a case. What does that have to do about me going on leave with pay? You know, he tells me that we're going to have an independent investigator. No, he's going to have your firm to try to collect whatever information that you can to discredit me. And so he was very clear that prior to even having an investigation, he was anticipating that if I was going to be going to court, he wins. He was very clear of that.

[Doc. 51-5 p. 156:12-22] Plaintiff also submits that Superintendent Rounds, through his Associate Superintendent, was pressuring Plaintiff to resign or accept a different position since May of 2010. [Doc. 51-2, pp. 85:14 to 86:8; Doc. 51-5, pp. 125:8-20, 155:9 to 156:11, 172:15 to 173:3] However, Defendant produced evidence, which Plaintiff did not controvert, that the complaints about Plaintiff began in May of 2010. [Doc. 45-1, p. 15, ¶ III(7)] Further, the record does not support a finding of any adverse action against Plaintiff until he received the Notice of Termination. Thus, again, this evidence does not call into question Defendant's purported legitimate reason for declining to renew his employment contract, i.e. the complaints of sexual harassment and Report of Investigation based on those complaints.

Plaintiff also contends that Superintendent Rounds knew since childhood the person who conducted the investigation, and thus the investigation was not independent. [Doc. 51, p. 7, ¶7] Superintendent Rounds testified that he had known the investigator as a child through a family friend, that she had been married to a family friend's son, that it was not an ongoing friendship, that he rediscovered her in her professional role in the Los Lunas Public

26

Schools, and that he trusted her professional judgment. [Doc. 51-2, pp. 28:21 to 30:24] He further testified that counsel for the Las Cruces Public Schools contacted her to investigate the complaints regarding Plaintiff and that he (Rounds) neither requested nor suggested that she be the investigator. [Doc. 51-2, p. 31:9-17] The Court concludes that, without more, such evidence of a childhood acquaintanceship followed by an approximately 17 year professional acquaintanceship between the decision-maker and the investigator is insufficient to establish pretext or a procedural irregularity.

Plaintiff next argues that the investigation was "extremely one-sided" and testified that the Defendant solicited only people who would complain about him to be interviewed. Plaintiff testified:

> A.  . . . You know, I think I need to go back to that that's all part of the ploy of all these individuals that Stan has kind of round up and influenced, because knowing that I was doing my job, I was very respected within the community, he didn't like me to be around; so he solicited these type of – from these individuals.
> Q.  And in what manner did he – what evidence do you have that he solicited [a witness] in any way?
> A.  Because that's exactly how your investigator did her work.
> Q.  How did my investigator –
> A.  She wanted to collect as many people's names that were going to say something bad about me, as many people as they could.
>  . . .
> A.  . . . You have an investigator that's out there, Hey, let's find dirt on Mr. Zamora. . . . This is all part of you getting your investigator to be able to go and find what anybody can say, as negative as it may be.  Let's just say it, put it out there and use them for my pawns to be able to ultimately try to get him to resign, to quit, or, No. 1, to terminate him.

[Doc. 51-5, pp. 139:11 to 140:1, 146:10-20]

The report indicates that the Investigator was instructed by Defendant's counsel that

"the focus of the investigation would be to investigate Dennis Zamora regarding allegations

of a hostile work environment and allegations of sexual harassment." [Doc. 45-1, p. 15]

Additionally, the Report of Investigation states:

> Upon hearing of the investigation of Dennis Zamora, Erlinda Martinez, Director of Federal Programs and immediate supervisor of Dennis Zamora, asked to be interviewed.  Further, she asked that people who were supportive of Dennis Zamora also be interviewed.  Erlinda Martinez supplied three (3) employee names. . . . Those three (3) employees were interviewed."

[Doc. 45-1, p. 22]

Viewing the evidence in the light most favorable to Plaintiff, and granting all

reasonable inferences from that evidence in Plaintiff's favor, the Court will assume that the

investigator specifically searched out individuals who she believed would complain that

Plaintiff either created a hostile work environment or sexually harassed them.  However, if

there were, as here, allegations of a hostile work environment and harassment, the fact that

Defendant in its investigation attempted to discover all complaints against Plaintiff does not

indicate any irregularity.  Defendant could reasonably believe it was required by its own

Sexual Harassment Policy to conduct an investigation. The policy stated, among other things,

"It is the intention of the LCPS to take whatever action may be needed to prevent, correct,

and, if necessary, discipline behavior which violates this policy." [Doc. 45-2, p. 3, ¶ II].

Further, Plaintiff and four employees who clearly supported him were interviewed during the

investigation, which simply does not support that the investigation was "extremely one-

sided."  The Court concludes that this evidence does not create a genuine issue of material

fact as to pretext.

Plaintiff submits that he was not afforded a due cause hearing even though another administrator who was charged with sexual harassment was "afforded the right to meetings and representation." [Doc. 51, pp. 13-14; Doc. 51-2, pp. 51:9 to 52:18] Defendant submits that it was not required to provide Plaintiff any hearing because Plaintiff was an administrator, and Plaintiff fails to dispute this contention.   [Doc. 61, p. 4] Granting all reasonable inferences for Plaintiff, a jury could conclude that there was differential treatment between Plaintiff and the other administrator.  However, that other administrator was also of Hispanic National Origin. [Doc. 45-1, p. 38, ¶ 10] Thus, this evidence does not suggest differential treatment based on National Origin.

Finally, Plaintiff argues that the evidence as a whole demonstrates pretext. Considering the evidence as a whole, the Court determines that no reasonable juror could conclude that Defendant's reason for terminating Plaintiff was pretextual, and Plaintiff has failed to meet his burden of showing a genuine issue of material fact.  Thus, summary judgment is appropriate.

### *Hostile Work Environment*

Plaintiff's complaint alleges a hostile work environment. [Doc. 1, p. 1] Defendant argues that Plaintiff has failed to proffer evidence of the pervasive and severe harassment required to establish a hostile work environment. [Doc. 45, p. 26] Defendant further contends it had in place a complaint process by which individuals could complain of a hostile work environment, which Plaintiff never utilized, and thus "the School District cannot be held liable because there is no way it could have known of such allegations." [Doc. 45, p. 27]

Plaintiff has neither proffered evidence of harassment or a hostile work environment, nor has Plaintiff argued that he complained of a hostile work environment. [See Doc. 51 pp. 14-16] The Court therefore determines that Plaintiff has abandoned his claim for a hostile work environment and that he has failed to meet his burden of proffering evidence of a hostile work environment. *See Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005) ( "To establish the existence of a hostile work environment actionable under Title VII, a plaintiff must show (1) that she was discriminated against because of her sex [or race]; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.").

## CONCLUSION

For the reasons set forth above, Defendant's motion will be granted.

**IT IS THEREFORE HEREBY ORDERED** that Defendant's Motion for Summary Judgment be and hereby is granted.

**SO ORDERED** this 22nd day of May, 2013 in Albuquerque, New Mexico.

M. CHRISTINA ARMIJO
Chief United States District Judge

30